NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-589

COMMONWEALTH

vs.

MARK BARRY.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

In 2013, the defendant pleaded guilty to two counts of possession of child pornography.  In 2015, he filed a motion to withdraw his guilty plea and for a new trial (later amended in 2017), alleging that his plea counsel was ineffective for failing to file a motion to suppress evidence and statements and that his plea was not knowing and voluntary because of his mental health limitations.[1]  The motion judge, who was not the

---

[1] The 2017 motion, filed pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), was an amendment to the one filed in 2015.  In his amended motion, the defendant asserted additional grounds to withdraw his plea, specifically, that his cognitive processing issues and developmental delays due to cerebral palsy prevented him from voluntarily consenting to the interactions with police in 2012 and during his 2013 plea colloquy.

plea judge, denied the defendant's motion without an evidentiary hearing, and the defendant now appeals. We vacate and remand for an evidentiary hearing on the defendant's amended motion.

Background. Although the Superior Court judge who accepted the defendant's change of plea ordered an evidentiary hearing on the defendant's motion to withdraw his guilty plea, the motion judge subsequently assigned to the case proceeded without one. The motion judge relied on grand jury testimony and police reports for the facts recited in his decision, and therefore we do as well.[2] Like the motion judge, we did not see the witnesses firsthand; nor was there an opportunity for cross-examination.

On August 9, 2012, an Amtrak "red cap" at South Station observed the defendant surreptitiously taking pictures of an eleven year old girl on his cell phone. The girl was wearing a dress and sitting on a bench next to her parents. The red cap walked behind the defendant to confirm that the image of the girl was on the defendant's phone and, once confirmed, he attempted to find a police officer. Unable to find a police officer, the red cap alerted a uniformed Amtrak patrol officer of the defendant's behavior. The red cap and Amtrak officer

_____

[2] We acknowledge that the grand jury minutes remain impounded and discuss them only as necessary to resolve this appeal.

2

approached the defendant, and the defendant attempted to quickly walk away. The Amtrak officer told the defendant to stop.

At that time, another Amtrak officer approached the defendant, resulting in the defendant being boxed in by the Amtrak employees. One of the Amtrak officers asked the defendant if he could hold the defendant's phone. The officer asked for the phone to prevent the defendant from running away. The defendant complied and gave the officer his phone. The officer then asked the defendant if he would come with him to the station services office; the defendant complied and followed the officer. At no point during this interaction did the Amtrak officers handcuff the defendant or place him under arrest. Once in the office, an Amtrak officer contacted the Massachusetts Bay Transportation Authority (MBTA) police department.

Before the MBTA police arrived, one of the Amtrak officers asked the defendant if she could look at the photographs in his phone; the defendant complied. The officer saw photographs of the girl wearing a dress and could view the girl's underwear in at least one of the photographs. When the Amtrak officers questioned the defendant, he admitted to taking the photographs.

An MBTA detective arrived approximately fifteen minutes later; the detective stated that she provided the defendant with his Miranda warnings, though there was no signed record of that,

3

and questioned him.  After the defendant admitted to photographing the girl, the detective took him to transit police headquarters for a recorded interview.[3]

At the outset of the interview, the defendant was reminded that he was given his Miranda warnings at the South Station Amtrak office.  The detective read the defendant his Miranda warnings a second time and asked the defendant to sign the form.  The detective then asked the defendant if he wanted to continue to talk to the police.  In response, the defendant said, "I guess I'll talk, but I don't know," and asked if he was "allowed to leave."  He was told he could not leave, although he was also told, "You're not under arrest though.  I'm not arresting you right now.  But I'm just saying that I would rather talk to you because some things are questionable."  The defendant asked again if he was under arrest, and was told the following:

> "You're not under arrest right now, no.  But I would have to discuss it with my supervisor on whether or not I would place you under arrest.
>
> "Ultimately, what I would like to do is get consent from you to look through this telephone, signed consent because you see that this phone is frozen on a picture right now. . . .
>
> "I'm not going to look through the telephone, but I can get a search warrant for the phone."

The detective continued,

---

[3] We have the video recording and transcripts of that interview.

4

"Even if you were arrested tonight, I need to find out what's going on with you.  Why these pictures are being taken and what help we can get you.  Does a person who's taking pictures of young girls just need to get locked up and do prison time, does that help them?  I don't know.  I don't think that it does.  So do I need to talk to the DA and say hey, we need a different avenue for this; we need to go down a different avenue.  This guy, obviously, needs some help because he's got something going on.

. . .

"I don't want you to continue to talk to me if you're saying that you're concerned about talking to me.  I would have to have you sign this form first saying yes, you agree to talk to me.  I have to protect you and your rights.  If you don't want to talk to me, you don't have to talk to me.  You don't have to talk to us.  You don't have to do that.

"But then, like I said, I would have to get a search warrant for the telephone.  We're going to look into the telephone.  We'll probably get a search warrant for your apartment.  Go back to your apartment and look in your apartment and see what else is in there.  I mean because now do I have to be concerned that there's pornography or pictures of small children in your apartment.  If you have a computer at your apartment, do I have to worry that there's anything there?  Do I even have to worry that there's a small child tied up somewhere in your apartment?  I know it sounds a little crazy, right, but see if I don't talk to you, what am I to go off of?  But if we can talk, if we can [get] some dialogue going, if you can tell me what's going on with you, what type of things that you prefer, what fetish you have, if I can get a better understanding of who you are, then I know what I'm dealing with and I know what I have to do and what I have to say to the DA, if the DA has to get involved in something like this and we say where do we go from here.  Does that make sense to you?

. . .

5

"Do you think you want to talk to us and tell me what's going on with you?  Why you are taking pictures like this of small kids?  Because then I have a concern like you said that you have some nieces; do I have to be concerned that something is going to happen to your nieces?  And is it your sister or your brother that have children?"

The defendant responded, "My brother."  The detective continued, "Your brother, okay.  So you don't want your brother concerned about the kids, do you?"  The defendant said, "No."  The detective responded,

"You want to be able to have a relationship with those kids and so how do we get past this where you would be able to have a relationship with those children.  I think those are legitimate questions that I have for you.  But it's up to you whether or not you want to talk about it.  I don't want to force you into anything.

"However, one way or another, even if you decide that you don't want to talk to me, I'm going to leave this office right now.  I'm going to leave you here just for a couple of minutes and I'm going to discuss it with my supervisor about what we're going to do.  I mean I already know that if you don't want to consent to a search of this telephone, we're still going to get a search warrant for the telephone because of the one picture because of the family.  The family saw you taking pictures of the girl underneath her skirt.  The family saw that and there is a picture there, right Mark?  I mean you know that it's there.  So that's why I want to be able to get past this, get past the Miranda portion of it, if you agree to talk to us.  If not, we're going to decide what else we're going to do if we do need to make an arrest, if we do have to arrest you tonight.  I do have to make that decision.

"I'm just saying to you at this point, I'm not going to place handcuffs on you, but at some point tonight, I may do that.  I may not let you walk out of here tonight."

6

The defendant replied, "I've never touched anyone in my life." The detective said, "So this is saying that you agree to talk with me?" The defendant responded, "Yes, yes," and then signed the Miranda warnings form.

Shortly thereafter, the defendant's girlfriend called his phone and before he answered, the detective told him, "You don't have to tell her anything right now . . . you don't have to tell her that you're at the police station." Ultimately during the interrogation, the defendant consented to the search of his phone, and in response to the interrogation, made incriminating statements. The next morning, the defendant signed another waiver of his Miranda rights and a waiver of his right to arraignment after an officer told him falsely, "This is so you know you're not going to be here all day." In response to interrogation, the defendant again made incriminating statements.

Ultimately, a search warrant was executed of the defendant's cell phone and revealed two images of prepubescent girls dressed in adult lingerie and posed provocatively with underwear revealing part of their genital areas.

On May 8, 2013, the defendant pleaded guilty in Superior Court to two counts of possession of child pornography, G. L.

7

c. 272, § 29C, first offense.[4]  On October 20, 2015, the defendant filed a motion to withdraw his guilty plea and for a new trial.  Therein, he claimed that his counsel failed to file motions to suppress evidence and statements.

Both the defendant and Commonwealth requested an evidentiary hearing on the motion to withdraw the guilty plea. On July 18, 2016, the plea judge ordered an evidentiary hearing on the defendant's motion.  However, the scheduling of the hearing was stayed pending the defendant's amended motion, which was docketed on July 20, 2017.  In his amended motion, the defendant asserted additional grounds to withdraw his plea, specifically, that his cognitive processing issues and developmental delays due to cerebral palsy prevented him from voluntarily consenting to the interactions with police in 2012 and during his 2013 plea colloquy.  In support, the defendant submitted affidavits from his sister and a psychologist.

The plea judge also allowed the defendant's motions for expert funds.  Through discovery, the defendant obtained medical records and a neuropsychological exam report.  Notably, they reflect that at around the age of fifty-five, the defendant

_____

[4] Pursuant to the plea agreement, the defendant's third indictment, for photographing a nude or partially nude person, G. L. c. 272, § 105, was dismissed and the counts for possession of child pornography were reduced from subsequent offense counts to first offense counts.

8

presented with a "substandard logical reasoning ability," similar to that of a nine year old child. A 2018 report summarized the defendant to have an "impaired intellectual ability . . . stemming from a medical issue, cerebral palsy." His intelligence quotient (IQ) scores -- which have tested between sixty-seven and ninety during his life -- have resulted in "a severe learning disability that affects his ability to integrate and organize his perceptual and emotional experience."

Prior to the evidentiary hearing, the case was assigned to another judge (motion judge) and hearings were held. Defense counsel informed the motion judge that he intended to call two experts, a psychologist who would testify regarding the defendant's cerebral palsy and another expert on police coercive techniques used by the MBTA police. The motion judge requested that the parties submit a filing detailing the grounds that exist to withdraw the plea, including from any information gleaned during discovery. The judge stated that after he reviewed the filings, he "might hold a hearing." He went on, "It might be evidentiary or not. It depends on what your filings say. I'm not denying a hearing, but until I see the papers, I'm not exactly sure what kind of a hearing we need."

9

On April 14, 2023, the motion judge denied the defendant's motion without holding an evidentiary hearing. The defendant timely appealed.

Discussion. Generally, we review a motion judge's decision whether to hold an evidentiary hearing for an abuse of discretion. See Commonwealth v. Denis, 442 Mass. 617, 628 (2004). Where, as here, however, the motion judge was not the plea judge, and the motion judge only reviewed documentary evidence, we review the denial of a motion for a new trial de novo. See Commonwealth v. Mazza, 484 Mass. 539, 547 (2020). See also Commonwealth v. Lykus, 451 Mass. 310, 326 (2008) (where motion judge was not trial judge and took no evidence, review on appeal is de novo).[5]

"Although a defendant's motion and affidavits need not prove the issue raised, to be adequate they must at least contain sufficient credible information to cast doubt on the issue" (emphasis added; quotation and citation omitted).

_____

[5] We give deference to the plea judge who ordered the evidentiary hearing. See Commonwealth v. Lastowski, 478 Mass. 572, 575 (2018). See also Commonwealth v. Sullivan, 435 Mass. 722, 733 (2002) (awarding substantial deference to trial judge on issue whether to hold evidentiary hearing). Here, the first judge, who had taken the defendant's plea, ordered an evidentiary hearing on the defendant's claim for ineffective assistance of counsel. As discussed infra, we agree that an evidentiary hearing should have been ordered on the defendant's motion (and amended motion) for a new trial.

10

Commonwealth v. Lys, 481 Mass. 1, 5 (2018).  An evidentiary hearing should be conducted "where a substantial issue is raised and is supported by a substantial evidentiary showing." Commonwealth v. Stewart, 383 Mass. 253, 260 (1981).  See Commonwealth v. Drayton, 473 Mass. 23, 36-38 (2015), S.C., 479 Mass. 479 (2018) (substantial issue raised regarding admission of witness's affidavit that directly contradicted incriminating testimony by purported eyewitness).  "In determining whether a motion for a new trial warrants an evidentiary hearing, both the seriousness of the issue itself and the adequacy of the defendant's showing on that issue must be considered."  Denis, 442 Mass. at 628.

A motion for new trial alleging ineffective assistance of counsel "raises 'an issue of constitutional importance' that readily qualifies as a serious issue" depending on the adequacy of the showing with respect to that issue.  Denis, 442 Mass. at 629, quoting Commonwealth v. Licata, 412 Mass. 654, 661 (1992). Here, the defendant's motion for a new trial adequately raised substantial issues regarding ineffective assistance of counsel.

The defendant's motion for new trial asserts two grounds: (1) his counsel was ineffective for failing to file a motion to suppress both the photographs on his cell phone and the

11

statements he made while in custody,[6] and (2) his plea was not knowing or intelligent because of his mental health limitations.

1. _Failure to file a motion to suppress_. When a defendant asserts a motion for a new trial based on the failure of counsel to file a motion to suppress, "the defendant has to demonstrate a likelihood that the motion to suppress would have been successful." Commonwealth v. Comita, 441 Mass. 86, 91 (2004). "We analyze that likelihood objectively, 'given what [the attorney] knew or should have known at each relevant moment in time,' and without 'the advantage of hindsight'" (citations omitted). Commonwealth v. Gosselin, 486 Mass. 256, 260 (2020).

The defendant argues that there were three different reasons a motion to suppress likely would have succeeded: (1) the defendant was seized without reasonable suspicion or probable cause; (2) the waiver of his Miranda rights was invalid; and (3) the statements and consent to search were involuntary as a matter of due process. His argument is that

---

[6] The motion judge concluded that the defendant's counsel strategically chose to forgo filing a motion to suppress because the defendant was facing a five-year mandatory minimum sentence for the two child pornography counts as charged. However, counsel claimed that she did not file a motion to suppress not as a strategic matter or because she thought it lacked merit, but because she "thought that the court would not allow the motion."

the defendant's statements and consent to search his phone were fruits of any and all of these errors.

a. Seizure of the defendant. "A person is seized by the police only when, in light of all the attending circumstances, a reasonable person in that situation would not feel free to leave." Commonwealth v. DePeiza, 449 Mass. 367, 369 (2007). "[A]n investigatory stop is constitutionally justified if it is conducted on reasonable suspicion that the person seized has committed, is committing, or is about to commit a crime." Id. at 371. Such "suspicion must be grounded in 'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a 'hunch.'" Id., quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). "If an officer exceeds the scope of an investigatory stop, the seizure becomes an arrest," requiring probable cause to believe a crime has been committed. Commonwealth v. Manha, 479 Mass. 44, 48 (2018). "Whether a stop is a seizure, requiring reasonable suspicion, or an arrest, requiring probable cause, depends upon the circumstances of each case." Id.

"Whether an encounter between a law enforcement official and a member of the public constitutes a noncoercive inquiry or a constitutional seizure depends upon the facts of the particular case." Commonwealth v. Matta, 483 Mass. 357, 363

13

(2019).  For instance, "coercion must be objectively communicated through the officer's words and actions for there to be a seizure."  Id. at 364.  "[A]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure . . . if the target of the inquiry refuses to answer and the police take additional steps . . . to obtain an answer" (quotations and citations omitted).  Commonwealth v. Barros, 435 Mass. 171, 174-175 (2001).

The Supreme Judicial Court reasoned in Barros, 435 Mass. at 172, that an officer's initial request of a defendant, "Hey you . . . I want to speak with you" was not a seizure.  See id. at 174.  Whereas, the officer's second request, "Hey you.  I wanna talk to you.  Come here," id. at 172, which was accompanied by the officer stopping his cruiser, walking up to and pointing at the defendant, "had a compulsory dimension to it that the first request did not."  Id. at 174.  As such, the officer's second request was "what a reasonable person would understand as a command that would be enforced by the police power."  Id. at 176.  The court went on, "[e]vidence that the defendant did in fact stop suggests that he believed, as would any reasonable person, that he was not free to leave."[7]  Id.

———————————

    [7] As this court recently explained,

14

Here, one officer testified to the grand jury that as he was walking toward the defendant the officer said, "Hey, just a minute."  In response, the defendant "looked at [the officer], he looked away, and then he stopped."

The Amtrak officer's statement "Hey, just a minute" is similar to the officer's first request in Barros, 435 Mass. at 172.  The red cap, however, testified that the officer told the defendant was told to stop.  The red cap's testimony clearly indicates a command to stop.[8]  This conflicting grand jury testimony must be resolved by an evidentiary hearing.

The Amtrak officer then asked the defendant "if it was okay that if [sic] I held on to his phone," explaining to the grand jury that he asked for the phone "so [the defendant] wouldn't

---

> "In the context of whether a police officer had 'seized' the defendant, for which reasonable suspicion of criminal conduct is required, the Supreme Judicial Court observed that because civilians rarely feel 'free to leave' a police encounter, the more pertinent question is whether an officer has, through words or conduct, objectively communicated that the officer would use his or her police power to coerce that person to stay" (quotations and citation omitted).

Commonwealth v. Earl, 102 Mass. App. Ct. 664, 670 n.4 (2023), citing Matta, 483 Mass. at 360, 362.

[8] Without hearing any evidence, the motion judge concluded that all Amtrak police were not State actors and thus not subject to constitutional restraints on searches and seizures. Amtrak is an agency or instrumentality of the United States. See Lebron v. National R.R. Passenger Corp., 513 U.S. 374, 394 (1995).

run away from [him]." Whether the officer's request for the defendant's cell phone transformed this encounter to a seizure also depends on the particular facts, necessitating an evidentiary hearing. See Commonwealth v. Hilaire, 92 Mass. App. Ct. 784, 790 (2018), quoting Commonwealth v. Greenberg, 34 Mass. App. Ct. 197, 201-202 (1993) ("Whether one who hands his property over to the police at their request voluntarily consents, or merely acquiesces to a claim of lawful authority, presents a question of fact"). See also Commonwealth v. Lopez, 451 Mass. 608, 611 (2008) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred" [citation omitted]); Commonwealth v. Perry, 62 Mass. App. Ct. 500, 502 (2004) (showing authority by "attempting to block or control an individual's path, direction, or speed, or commanding the individual to halt" may be considered a pursuit, which, when "designed to effect a stop is no less intrusive than a stop itself" [citations omitted]).

At the time the defendant was seized, either when he stopped walking away from the officer or when the officer obtained the defendant's cell phone, based on the record before us, the officers lacked "specific, articulable facts" that the defendant committed (or was going to commit) a crime. See

16

DePeiza, 449 Mass. at 371, quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). The defendant was observed taking photographs of a girl at the train station. Although his behavior or posture may have been unusual,[9] and upsetting, and while his actions were certainly cause for concern, it is undisputed that the girl who was the object of his photography was clothed. It is not a crime to take a picture of a young girl with clothes on. See G. L. c. 272, § 105, inserted by St. 2008, c. 451, § 149 (criminalizing one who "willfully photographs, videotapes or electronically surveils another person who is nude or partially nude" [emphases added]);[10] G. L. c. 272, § 29C (vii) (criminalizing possession of photographs depicting or portraying a child that is, among other things, "depicted or portrayed in any pose, posture or setting involving a lewd exhibition of the unclothed genitals, pubic area, [or] buttocks" [emphasis added]). Moreover, the images viewed by the red cap and the various officers prior to the forensic search of the phone, to which the defendant ultimately consented that night, depicted the girl's "whole body" and, the girl was

---

[9] The red cap attendant described the defendant as "strange looking," and said that the defendant appeared to be facing one way, while pointing his camera in a different direction to photograph the minor girl.

[10] We cite the version of the statute in effect at the time of the defendant's arrest.

17

clothed.  Likewise at least the record before us shows no additional basis for probable cause by the time the defendant was incontrovertibly in custody when the transit police took him to headquarters and told him he could not leave.

Based solely on the record before us, the defendant's behavior was not illegal given the plain language of the statute.  Nor is there anything in the record before us that indicates that there was reasonable suspicion for the defendant's seizure at any point in time prior to his responding to the interrogation at the transit police headquarters.[11] Nevertheless, the Commonwealth should have the opportunity to present additional facts, if any, at an evidentiary hearing, that might justify the seizure.  See Commonwealth v. Santos, 95 Mass. App. Ct. 791, 798 (2019) ("In these circumstances, the correct result on appeal is to decline to reach the merits of the issue raised for the first time on appeal because it depends on the development of facts not in the record before us").  See also Commonwealth v. Brule, 98 Mass. App. Ct. 89, 92 (2020) (record inadequate to review newly raised claim of whether officer conducted unlawful search where circumstances of patfrisk were not developed in trial court); Hilaire, 92 Mass.

_____

[11] It was also not reasonable to think that the statute covered clothed individuals when it clearly did not.

18

App. Ct. at 785 (eliciting facts at evidentiary hearing to establish probable cause to stop defendant).[12]

   b. _Defendant's interrogation_. The defendant's motion for new trial also asserts that defense counsel was ineffective for failing to move to suppress his statements given to the police at the time of his interrogation. The defendant submits that he was in custody and that his statements were given in violation of Miranda, and that they, and the consent to search his phone,

_____

[12] The Commonwealth asserts that there was also reasonable suspicion at the time of the initial stop that the defendant was guilty of "annoying and accosting a person of the opposite sex" in violation of G. L. c. 272, § 53, as amended through St. 2009, c. 27, § 98, on the basis that there were "specific and articulable facts established that the defendant was taking photographs of the eleven-year-old victim, while sitting 20 feet away from, attempting to do so surreptitiously, and the victim was so uncomfortable that she was crying, and her parents feared he would post them online." This argument is wrong. The statute requires an act that is not only offensive, but disorderly. "'[D]isorderly' acts or language 'are those that involve fighting or threatening, violent or tumultuous behavior, or that create a hazardous or physically offensive condition for no legitimate purpose of the actor, whether the resulting harm is suffered in public by the public or in private by an individual.'" Commonwealth v. Sullivan, 469 Mass. 621, 626 (2014), quoting Commonwealth v. Chou, 433 Mass. 229, 233 (2001). "With respect to the creation of a 'physically offensive' condition under G. L. c. 272, § 53, 'physical contact with a victim's person is not necessary to render one's actions physically offensive.' However, a defendant must create a condition that would cause a reasonable person to fear imminent physical harm." (Citations omitted.) Sullivan, supra at 627. There is nothing in the record that amounts to a physically offensive act here; the defendant was twenty feet away from the family, trying not to be seen. Nor was there any threatening by the defendant, who communicated nothing to anyone by his conduct. Compare Chou, supra at 234.

19

were fruit of that poisonous tree.  Among other things, whether he was in custody involves unresolved questions of fact.

He argues that he was not, in fact, given Miranda warnings by the detective in the office at South Station.  Again, this, at the least involves a question of fact.  To the extent that the defendant's reference to the "substantial coaxing from" the MBTA detective prior to his signing the waiver of Miranda at the police station is intended to challenge the validity or voluntariness of that waiver, the issues are the same as those described below with respect to the voluntariness of his statements and consent at his interrogation at the transit police headquarters, see infra.

The defendant argues that the statements and consent given in that interrogation were involuntary in the constitutional sense.  The test for voluntariness is "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act."  Commonwealth v. Raymond, 424 Mass. 382, 396 (1997), S.C., 450 Mass. 729 (2008), quoting Commonwealth v. Selby, 420 Mass. 656, 663 (1995), S.C., 426 Mass. 168 (1997).  Factors which can be relevant to the determination of voluntariness include the defendant's age, education, intelligence, emotional stability,

experience with the criminal justice system, and any discussion of leniency or a deal by police or other promises or inducements.  See Commonwealth v. Mandile, 397 Mass. 410, 413 (1986).  Although the interrogation tactic of minimization does not compel a conclusion that a confession is involuntary, see Commonwealth v. Harris, 468 Mass. 429, 436 (2014), it is problematic, as implied assurances of leniency or "now or never" propositions by officers can lead a judge to determine that a confession was not freely and voluntarily made.  See Commonwealth v. Baye, 462 Mass. 246, 257 (2012).  Finally, and critically,

> "[w]hile the promise of psychiatric help standing alone will not invalidate a statement, it may if the help is offered as a quid pro quo for the statement, or if it, in the totality of circumstances, overbore the defendant's free will, inducing in him a belief that help, rather than punishment, would be forthcoming" (citation omitted).

Commonwealth v. Felice, 44 Mass. App. Ct. 709, 712 (1998).

Review of the video footage and transcript from the defendant's interrogation may lead a motion judge to conclude that the defendant's will was overborne.  See Baye, 462 Mass. 255.  The detective said that if the defendant spoke with her, but only if he did so, she would talk to the district attorney about going down a "different avenue" than criminal prosecution. On the record we have, this appears to amount to an impermissible quid pro quo, see Commonwealth v. Magee, 423 Mass.

21

381, 387-389 (1996), because the detective told the defendant that if he spoke to her, she would work to see that the defendant would "not be prosecuted and would not go to jail." Felice, 44 Mass. App. Ct. at 714.

Nonetheless, as with the claim that there was no reasonable suspicion or probable cause for the detention at the transit police headquarters, the record is inadequate for us to decide the issue, and we think the Commonwealth should have an opportunity to present any relevant additional evidence it may have to meet its burden of establishing voluntariness. See Santos, 95 Mass. App. Ct. at 797-798.

Additionally, a motion judge, who hears evidence regarding the defendant's mental health limitations could reasonably conclude that the defendant's waiver of his Miranda rights was not valid. Thus, again barring a conclusion by the judge that suppression was required on any of these other grounds, an evidentiary hearing regarding the defendant's mental health limitations in consideration of what took place during the defendant's interrogation is warranted.

c. Voluntariness of the defendant's plea. Lastly, we address the defendant's assertion that his plea was not voluntarily made as a matter of due process. Factual questions also remain unanswered regarding the voluntariness of the

22

defendant's plea. See Commonwealth v. Buckley, 478 Mass. 861, 875 (2018), quoting Commonwealth v. Harmond, 376 Mass. 557, 561 (1978) ("Voluntariness of consent 'is a question of fact to be determined in the circumstances of each case'"). An evidentiary hearing would produce information regarding whether the defendant's plea was knowing, voluntarily, and intelligent in light of his mental health limitations. The motion judge reasoned, "Nothing in this case suggests that [the defendant's] psychological condition prevented him, a man experienced in the criminal justice system, from understanding his rights and voluntarily waiving them." However, the motion judge did not have any evidence before him regarding the defendant's limitations because plea counsel did not address the defendant's mental health limitations. The defendant planned to have his expert testify at an evidentiary hearing to provide evidence supplied in the affidavits.

Conclusion. We acknowledge that a judge has discretion in deciding whether to hold an evidentiary hearing. See Commonwealth v. Meggs, 30 Mass. App. Ct. 111, 114 (1991). A judge also has discretion in deciding whether to discredit affidavits submitted in support of a motion for a new trial. Commonwealth v. Vaughn, 471 Mass. 398, 405 (2015). On this record, we believe the defendant has raised sufficient credible

23

and persuasive information, not dependent on an affidavit which a judge could determine was self-serving, on the issue whether his counsel was ineffective for failing to file a motion to suppress.  Compare Commonwealth v. Gilbert, 94 Mass. App. Ct. 168, 178 (2018).

We accordingly vacate the order denying the defendant's amended motion to withdraw his guilty plea and for a new trial and remand the matter to the Superior Court for proceedings consistent with this memorandum and order.

So ordered.

By the Court (Rubin,
  D'Angelo & Smyth, JJ.[13]),

Clerk

Entered:  March 11, 2025.

---

[13] The panelists are listed in order of seniority.